## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

S.K. INNOVATION, INC., *et al.*,

      Plaintiffs,

        v.

FINPOL, *et al.*,

      Defendants.

Civil Action No.  10-138 (JEB)

## MEMORANDUM OPINION

Plaintiffs are two Kazakhstani citizens and three United States corporations who seek to bring suit under the Alien Tort Statute, 28 U.S.C. § 1350, against two government agencies of the Republic of Kazakhstan.  Because this Court lacks subject-matter jurisdiction under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602 *et seq.*, their suit cannot proceed. Plaintiffs have also submitted a Proposed Amended Complaint that adds as defendants various Kazakhstani government officials.  As it contains no allegations of fact to support this Court's personal jurisdiction over the additional proposed defendants, the Court must find that its filing would be futile.

## I.    Background

According to the Proposed Amended Complaint, which must for now be presumed true, Plaintiffs Serik Bektayev and Adyl Bektayev are brothers who hold Ph.D degrees and describe themselves as "prominent businessm[e]n in Kazakhstan, with substantial international business activities, including in the U.S."  Prop. Am. Compl., ¶¶ 4-5.  Both are currently imprisoned in detention centers in Kazakhstan.  Id.  Plaintiffs S.K. Innovation, Inc. and S.K. Biolfuel, Inc. are

Virginia corporations of which the Bektayevs are principals and shareholders.  Id., ¶¶ 1-2.

Plaintiff Human Redemption Foundation is a Delaware non-profit corporation of which the

Bektayevs are members and beneficiaries, and which aims to end torture and the inhuman,

degrading treatment the Bektayevs allege they have suffered in Kazakhstan.  Id., ¶ 3.

Defendants are two Kazakhstani government agencies: the Agency on Economic Crimes

and Corruption, known as "Finpol," and the Committee on Penal Enforcement Facilities, as well

as 100 unnamed Doe defendants.  Id., ¶¶ 6-7.  In their Proposed Amended Complaint, Plaintiffs

seek to add five Kazakhstani government officials as additional defendants.  See id., ¶¶ 8-12.

Plaintiffs' Complaint is full of intrigue and misfortune for the Bektayevs, who have been

active in real estate and development projects in Kazakhstan for more than a decade.  See id., ¶¶

20, 25.  The story of the circumstances that led to their prosecution and imprisonment begins in

2005, when an officer of Kazakhstan's Interior Affairs Department (named as an individual

defendant in Plaintiffs' Proposed Amended Complaint) allegedly accepted "an illegal financial

contribution" from one of Serik Bektayev's business competitors to open a criminal investigation

into his activities.  See id., ¶ 32.  Over the next few years, Plaintiffs plead that Serik was

threatened by these competitors, who, in 2008, "made clear their demands [to Serik] to yield

[his] business interests" and claimed that "they were capable [of] destroy[ing] Serik's businesses

by using [Kazakhstani] law enforcement."  Id., ¶ 35.  In the spring of 2008, Serik became aware

that Finpol was investigating him and had initiated "one or more criminal cases" against him.

Id., ¶ 36.

Plaintiffs then describe a complicated scheme by which Serik's competitors sought to

gain control of (or "raid") his business assets.  See id.  For example, the Proposed Amended

Complaint alleges that one of Serik's business competitors forged a power of attorney

purportedly empowering him to manage and restructure "SN," one of the real-estate-development businesses with which Serik was involved.  See id., ¶¶ 28, 37-39.  This power of attorney was then "used to convert the holdings of SN and transfer the assets to another parent entity."  Id.  Plaintiffs plead that the fraudulent POA was then "readily used by authorities at the Ministry of Justice to take away from Serik the control over SN's assets."  Id.

Around this same time, according to the Proposed Amended Complaint, Serik was hospitalized for a heart condition and potential brain tumor.  See id., ¶¶ 42-44.  While "Serik was in the hospital," Plaintiffs plead on information and belief, "Finpol speedily prepared a criminal case against him, targeting SN's business and alleging financial improprieties, attributed to Serik and several of his employees."  Id., ¶ 44.  Plaintiffs then describe a series of physical and due-process abuses that they attribute to Defendants.  On July 26, 2008, Serik was summoned from the hospital to the prosecutor's office in Almaty, Kazakhstan, where he was interrogated regarding SN's business and accounting practices.  Id., ¶ 45.  While there, he "felt heart irregularities" and was eventually returned to the hospital, where he had a heart attack two days later while being held in the hospital's psychiatric ward.  Id., ¶¶ 45-46.  On July 29, the deputy prosecutor for Almaty came to Serik's hospital room and, while Serik was unconscious following the administration of medication, read to him "an accusatory act" and sought, over his doctors' objections, to remove him to a detention center.  Id., ¶ 47.  Plaintiffs allege Serik attempted to resist arrest, but was beaten, drugged, and removed to the detention center.  Id., ¶ 48.  "On information and belief, Finpol was directing these extraordinary measures applied to Serik."  Id., ¶ 49.

The Proposed Amended Complaint further catalogues abuses that Serik suffered while awaiting trial and sentencing in the detention center in Almaty.  It recounts numerous beatings,

see, e.g., id., ¶¶ 48, 58, 60; a host of untreated medical ailments, see id., ¶¶ 50-51, 53, 68; an official plot to kill him, see id., ¶¶ 54-57; his three suicide attempts, see id., ¶¶ 87, 90, 95; a defective pre-trial investigation, see id., ¶¶ 69-71; trial sessions fraught with "endless violations of the minimum procedural standards," see id., ¶ 73; and a very irregular conviction and sentencing.  See id., ¶¶ 92-97.

With respect to Serik's business interests, Plaintiffs allege that some unnamed third party used the fraudulent POA to vest control over SN in a Russian entity, ZAO Mars Systems of Radiolocation (Mars).  Id., ¶ 75.  They further allege that the real beneficiaries of the transfer were Serik's business competitors in Kazakhstan.  Id., ¶ 76.  Additionally, "[a]s a part of the prosecution," Plaintiffs allege Finpol froze the assets of SN, Serik, and his family.  Id., ¶ 80. "On information and belief, all that was [] done and endorsed by Finpol, to allow special interests to take control of those assets, to suppress Serik's and Adyl's resistance, and to resell those assets to third parties."  Id., ¶ 81.

Plaintiffs allege a similar series of events involving Serik's brother Adyl, who served as the principal of a Kazakhstani company called ABK-5 TOO.  Id., ¶ 99.  Like Serik, Adyl heard rumors that his competitors wanted to obtain his realty assets and raid his businesses.  Id., ¶ 100. Plaintiffs allege that after an investigation into Adyl was opened, the ABK-5 office "was raided, on information and belief, by certain authorities, believed to be Finpol's officers," who took "cash and documents held at the office" and "confiscated certain original[] sets of documents" from ABK-5's accountant.  Id., ¶¶ 108-09.  Instead of having "the documents audited by a certified government body, on information and belief, Finpol's officers passed the documents to a private accounting company, not licensed for audit, which was to prepare an accusatory document, doing so in collusion with those who ordered such an audit."  Id., ¶ 109.

Adyl was subsequently charged with an economic crime alleging that he failed to "fulfill his obligations [to] the shareholders in the development project Naurys." Id., ¶¶ 110.  On October 6, 2008, Adyl was arrested and has since been detained in the detention center in Astana, Kazakhstan.  Id.  Plaintiffs assert that while there, like Serik, Adyl has been beaten, id., ¶ 111; has suffered severe medical ailments for which he received inadequate treatment, id., ¶¶ 112-14; has been threatened by Finpol investigators, id., ¶ 115; and continues to be detained despite a court ruling that at least a portion of his detention  has been unlawful.  Id., ¶ 117.

On January 25, 2010, Plaintiffs brought this suit against Finpol and the Committee on Penal Enforcement Facilities asserting one claim under the Alien Tort Statute (ATS), also known as the Alien Tort Claims Act, 28 U.S.C. § 1350.  See Prop. Am. Compl., ¶ 149.  Defendants initially moved to dismiss the Complaint on April 5, 2010, under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Plaintiffs opposed the motion on July 23, 2010.  Following the D.C. Circuit's issuance of its opinion in Doe v. Exxon Mobile Corp., 654 F.3d 11 (D.C. Cir. 2011), last July, the Court permitted Defendants to rebrief their Motion to Dismiss and denied the original Motion as moot.  In accordance with the new briefing schedule approved by the Court, Defendants filed a new Motion to Dismiss on September 2, 2011.  Plaintiffs filed their Opposition on October 16, and Defendants filed a Reply on October 31.  The Motion is now ripe. Also ripe for decision are two motions subsequently filed by Plaintiffs that seek leave of the Court to amend the Complaint to add additional defendants.  The Court will consider each of these motions in turn.

II.     **Legal Standard**

A.     Motion to Dismiss

In evaluating Defendants' Motion to Dismiss, the Court must "treat the complaint's

factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be

derived from the facts alleged.'" Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C.

Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (internal

citation omitted); see also Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir.

2005). This standard governs the Court's considerations of Defendants' Motions under both

Rules 12(b)(1) and 12(b)(6).  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) ("in passing on a

motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for

failure to state a cause of action, the allegations of the complaint should be construed favorably

to the pleader"); Walker v. Jones, 733 F.2d 923, 925-26 (D.C. Cir. 1984) (same).  The Court

need not accept as true, however, "a legal conclusion couched as a factual allegation," nor an

inference unsupported by the facts set forth in the Complaint.  Trudeau v. Fed. Trade Comm'n,

456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)

(internal quotation marks omitted)).

To survive a motion to dismiss under Rule 12(b)(1), Plaintiffs bears the burden of

proving that the Court has subject-matter jurisdiction to hear their claims.  See Lujan v.

Defenders of Wildlife, 504 U.S. 555, 561 (1992); U.S. Ecology, Inc. v. U.S. Dep't of Interior,

231 F.3d 20, 24 (D.C. Cir. 2000).  A court has an "affirmative obligation to ensure that it is

acting within the scope of its jurisdictional authority."  Grand Lodge of Fraternal Order of Police

v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  For this reason, "'the [p]laintiff's factual

allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in

resolving a 12(b)(6) motion for failure to state a claim." Id. at 13-14 (quoting 5A Charles A.

Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1987) (alteration in

original)).  Additionally, unlike with a motion to dismiss under Rule 12(b)(6), the Court "may

consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack

of jurisdiction." Jerome Stevens, 402 F.3d at  1253.

      Rule 12(b)(6) provides for the dismissal of an action where a complaint fails "to state a

claim upon which relief can be granted."  When the sufficiency of a complaint is challenged

under Rule 12(b)(6), the factual allegations presented in it must be presumed true and should be

liberally construed in plaintiff's favor.  Leatherman v. Tarrant Cty. Narcotics & Coordination

Unit, 507 U.S. 163, 164 (1993).  The notice-pleading rules are "not meant to impose a great

burden on a plaintiff," Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005), and he or she

must thus be given every favorable inference that may be drawn from the allegations of fact.

Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 584 (2007).  Although "detailed factual

allegations" are not necessary to withstand a Rule 12(b)(6) motion, Twombly, 550 U.S. at 555,

"a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that

is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (internal quotation

omitted).  Plaintiffs must put forth "factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." Id.  Though a plaintiff may

survive a 12(b)(6) motion even if "recovery is very remote and unlikely," Twombly, 550 U.S. at

555 (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)), the facts alleged in the complaint

"must be enough to raise a right to relief above the speculative level." Id. at 555.

B.     Motion to Amend

A plaintiff may amend his complaint once as a matter of course within "21 days after serving it" or within "21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier."  Fed. R. Civ. P. 15(a)(1).  Otherwise, the plaintiff must seek consent from the defendant or leave from the Court.  The latter "should [be] freely give[n] . . . when justice so requires."  Fed. R. Civ. P. 15(a)(2).  In deciding whether to grant leave to file an amended complaint, courts may consider "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc."  Foman v. Davis, 371 U.S. 178, 182 (1962).  In this Circuit, "it is an abuse of discretion to deny leave to amend unless there is sufficient reason."  Firestone v. Firestone, 76 F.3d 1205, 1208 (D.C. Cir. 1996).  Furthermore, under Rule 15, "the non-movant generally carries the burden in persuading the court to deny leave to amend."  Nwachukwu v. Karl, 222 F.R.D. 208, 211 (D.D.C. 2004).

It is clear, however, that amendment should not be permitted if it would be futile.  In other words, if the proposed amendment would still render the complaint deficient, courts need not grant leave.  See In re Interbank Funding Corp. Securities Litigation, 629 F.3d 213, 218 (D.C. Cir. 2010) ("[A] district court may properly deny a motion to amend if the amended pleading would not survive a motion to dismiss.") (citing Forman, 371 U.S. at 182, for proposition that "'futility of amendment' is permissible justification for denying Rule 15(a) motion"); James Madison Ltd. v. Ludwig, 82 F.3d 1085, 1099 (D.C. Cir. 1996) ("Courts may deny a motion to amend a complaint as futile . . . if the proposed claim would not survive a motion to dismiss.").

8

### III.    Analysis

Defendants first contend that Plaintiffs' claims against them must be dismissed because, under the Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U.S.C. §§ 1330, 1602 *et seq.*, this Court lacks subject-matter jurisdiction over the case.  In addition, Defendants maintain that Plaintiffs' attempt to amend the Complaint to add individual defendants should be rejected as futile.  The Court will address these two points in turn.

### A.    Motion to Dismiss

#### 1.    *Applicability of the FSIA*

Plaintiffs' Proposed Amended Complaint seeks relief solely under the Alien Tort Statute. See Prop. Am. Compl., ¶ 149.  The ATS provides in full: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.  The Supreme Court has recognized that the ATS provides aliens with a private cause of action over the offenses of "violation of safe conducts, infringement of the rights of ambassadors, and piracy," as well as torts that "rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the[se] 18th-century paradigms."  Sosa v. Alvarez-Machain, 542 U.S. 692, 724-25 (2004).

Although the ATS is itself a jurisdictional statute, claims brought thereunder against a foreign state are nevertheless subject to the jurisdictional constraints codified in the FSIA.  See Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 443 (1989) (holding, in an ATS case, that "the FSIA provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country").  The FSIA both limits and grants jurisdiction to U.S. courts to hear cases brought against foreign sovereign nations.  The Act provides that "a foreign state shall be

immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter" and "[s]ubject to existing international agreements to which the United States [was] a party at the time of enactment."  28 U.S.C. § 1604.  Accordingly, "[u]nder the FSIA, a foreign state is immune from the jurisdiction of American courts unless the case falls within a statutory exemption."  Mwani v. bin Laden, 417 F.3d 1, 15 (D.C. Cir. 2005) (citing 28 U.S.C. §§ 1604, 1605-1607).  Conversely, if an FSIA exception does properly apply, this Court has subject-matter jurisdiction over such a case.  See 28 U.S.C. § 1330(a).

Defendants bear the burden to prove that they are entitled to immunity under the FSIA. See Princz v. Federal Republic of Germany, 26 F.3d 1166, 1171 (D.C. Cir. 1994).  Once each Defendant "make[s] a *prima facie* showing that it is a foreign state," however, Plaintiffs are faced with a burden of production to "assert[] at least some facts showing that one of the FSIA exceptions applies."  de Csepel v. Republic of Hungary, 808 F. Supp. 2d 113, 127 (D.D.C. 2011) (citing Agudas Chasidei Chabad v. Russian Fed'n, 528 F.3d 934, 940 (D.C. Cir. 2008)).  While the ultimate burden of persuasion remains with Defendants, where, as here, they can show that Plaintiffs' jurisdictional allegations are legally insufficient – that is, taken as true, Plaintiffs' factual allegations fail to bring the case within any of the exceptions to immunity that they invoke – a court properly finds that it lacks subject-matter jurisdiction and must dismiss the case. See Mwani, 417 F.3d at 15-16; see also Kilburn v. Socialist People's Libyan Arab Jamahiriya, 376 F.3d 1123, 1127, 1131 (D.C. Cir. 2004).

The first step in the Court's analysis is thus to determine whether Defendants Finpol and the Committee come within the definition of "foreign state" to which the FSIA applies.  For the purposes of § 1605, the term "foreign state" includes any "political subdivision" of the state as

well as its "agenc[ies]" and "instrumentalit[ies]."  Id., § 1603.  Defendants – Kazakhstan's

Agency on Economic Crimes and Corruption (Finpol) and its Committee on Penal Enforcement

Facilities – fit soundly within this definition.  Although Plaintiffs suggest that they "disagree"

with the proposition that Defendants are "proper instrumentalities of Kazakhstan," they make no

comprehensible argument to the contrary and in fact "make an assumption that Defendants

would prevail" on this point.  Opp. at 7.

      Indeed, Plaintiffs concede in their Proposed Amended Complaint that Finpol and the

Committee are both "government agenc[ies] of the Republic of Kazakhstan."  Prop. Am. Compl.,

¶¶ 6-7.  The Committee, they allege, is "a semi-autonomous body under the supervision of the

Ministry of Justice" and "is in charge [of] the supervision of detention and imprisonment

facilities in the Republic of Kazakhstan."  Id., ¶ 7.  They describe Finpol as "an organization

involved in regulating business in Kazakhstan."  Id., ¶ 6.  Plaintiffs' concession is sensible since

the law supports Defendants' position.

      In the context of applying the FSIA's service-of-process provision, codified at 28 U.S.C.

§ 1608, the D.C. Circuit has considered the distinction between a "foreign state or political

subdivision" and its "agency or instrumentality."  See Transaero, Inc. v. La Fuerza Aerea

Boliviana, 30 F.3d 148, 149-50 (D.C. Cir. 1994); Roeder v. Islamic Republic of Iran, 333 F.3d

228, 234-235 (D.C. Cir. 2003), superseded by statute on other grounds.  While making the

distinction is not necessary in cases such as this one involving analyses under § 1605, the rule is

helpful to illuminate the contours of the terms "foreign state" and "political subdivision."  This

Circuit has established a categorical rule: "[I]f the core functions of the entity are governmental,

it is considered the foreign state itself."  Roeder, 333 F.3d at 234.  Applying this rule, courts in

this Circuit and District have found any nation's armed forces, see Transaero, 30 F.3d at 153;

Iran's Ministry of Foreign Affairs, see Roeder, 333 F.3d at 234; Iran's Ministry of Information

and Security, see In re Islamic Republic of Iran Terrorism Litigation, 659 F. Supp. 2d 31, 48 n.10

(D.D.C. 2009); and Sudan's Ministry of the Interior, see Owens v. Republic of Sudan, 374 F.

Supp. 2d 1, 25-26 (D.D.C. 2005), among other government agencies, to be the state itself or a

political subdivision of the state, rather than an agency or instrumentality, for purposes of FSIA §

1608.

      Defendants here fit comfortably within this definition of "foreign state."  Like the

governmental bodies listed above, national law-enforcement agencies like Defendants perform

"important and 'indispensable' governmental function[s]."  See Roeder, 333 F.3d at 234-35.

Plaintiffs' assertion that Finpol "is not a constitutional body and not a part of the central

government in Kazakhstan" does not diminish this conclusion.  As the D.C. Circuit has

recognized, "Any government of reasonable complexity must act through men organized into

offices and departments." Transaero, 30 F.3d at 153.  Having "a separate name and some power

to conduct its own affairs" does not "suffice[] to make a foreign department an 'agency' rather

than a part of the state itself." Id.

      Plaintiffs perhaps try to insinuate that Defendant Finpol's activities have veered into the

commercial realm by alleging that it "has, in fact, become an organization involved in regulating

business in Kazakhstan, promoting certain special interests and often destroying legitimate

business." Prop. Am. Compl., ¶ 6.  This allegation does nothing to divest Finpol of its

presumption of sovereign immunity.  Even if the "core functions" of Finpol were "commercial"

rather than governmental – a proposition that Plaintiffs' Proposed Amended Complaint does not

support – Finpol would still qualify for the FSIA's presumption of immunity as "an agency or

instrumentality" of the state. See Roeder, 333 F.3d at 234; 28 U.S.C. § 1603.

The Court thus finds that Defendants are entitled to a presumption of immunity under the FSIA and moves next to consider whether an FSIA exception confers jurisdiction over Plaintiffs' ATS claim on this Court.  Before doing so, it is important to note that the U.S. corporate Plaintiffs lack standing to bring a claim under the ATS because they are not aliens.  See 28 U.S.C. § 1350 ("district courts shall have original jurisdiction of any civil action by an alien") (emphasis added); see also Mohamad v. Rajoub, 664 F. Supp. 2d 20, 21 n.1 (D.D.C. 2009), aff'd, 634 F.3d 604 (D.C. Cir. 2011), cert. granted on other grounds, 132 S. Ct. 454 (2011) (recognizing ATS does not confer jurisdiction over claims brought by non-aliens).  The Court will thus assess the ATS claims only of the individual Plaintiffs.

       2.    *Exceptions to the FSIA*

Plaintiffs assert that three separate FSIA exceptions establish this Court's subject-matter jurisdiction over their claims against Finpol and the Committee: (1) the "commercial activities" exception, 28 U.S.C. § 1605(a)(2); (2) the "expropriation" exception, id., § 1605(a)(3); and (3) the qualifying clause in § 1604 that limits the FSIA in accordance with "existing international agreements to which the United States [was] a party at the time of enactment."  The Court will consider each in turn.

       a.   Commercial-Activities Exception

Section 1605(a)(2), also known as the "commercial activities" exception, provides:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

28 U.S.C. § 1605(a)(2) (emphasis added).  Plaintiffs do not allege that Defendants engaged in any commercial activity in the United States or performed any acts here in connection with commercial activity; it is thus the third clause that they contend applies.

To evaluate Plaintiffs' claim, therefore, the Court must consider first, whether Plaintiffs have pled a "commercial activity" by Defendants; second, whether Plaintiffs have alleged an "act" taken "in connection with" that commercial activity upon which they base their claim; and third, whether there is a sufficient nexus between the act and the United States – *i.e.*, whether the act has "caused a direct effect" in this country.  Plaintiffs' Proposed Amended Complaint cannot survive the first inquiry.

The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act," and it states that "the commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." Id., § 1603(d).  "[W]hen a foreign government acts . . . in the manner of a private player within [a market], the foreign sovereign's actions are 'commercial' within the meaning of the FSIA."  Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 614 (1992).  In determining whether a foreign government's actions are commercial in nature, "the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives.  Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in 'trade and traffic or commerce.'"  Id. (quoting Black's Law Dictionary 270 (6th ed. 1990)) (emphasis in original).  Thus "a state engages in commercial activity . . . where it exercises 'only those powers that can

also be exercised by private citizens,'" as distinct from those '"powers peculiar to sovereigns.'"

<u>Saudi Arabia v. Nelson</u>, 507 U.S. 349, 360 (1993) (quoting <u>Weltover</u>, 504 U.S. at 614).

Plaintiffs here have failed to identify any "commercial activity" engaged in by Defendants Finpol or the Committee.  In their Opposition to Defendants' Motion to Dismiss, Plaintiffs argue only that "the confiscation of the property, depriving the American entities their rights, ultimately was akin to commercial activities of foreign agencies."  Opp. at 13-14.  The Court must thus consider whether official acts of "confiscation" and "extortion" constitute commercial activities – that is, the type engaged in by private parties in a market.  They clearly do not.

With respect to their business interests, Plaintiffs have alleged that various Kazakhstani government agencies and officials undertook the following actions:

- An officer of the Interior Affairs Department and Finpol initiated criminal investigations into both Serik and Adyl Bektayev, <u>see</u> Prop. Am. Compl., ¶¶ 32, 36, 108-09;

- Finpol "speedily prepared a criminal case . . . alleging financial improprieties" against Serik related to his management of corporation SN, while he was incapacitated in the hospital, and sought his detention and pursued its investigation of these crimes while he was similarly unwell, <u>id.</u>, ¶¶ 45-49;

- The Ministry of Justice used or relied upon a forged power of attorney supplied by an unnamed third party (possibly one of Serik's competitors) to recognize, process, and register the transfer of assets from corporation SN to another parent entity and out Serik's management control, while Serik could not effectively contest the transfer due to his incarceration,  <u>id.</u>, ¶¶ 37-39, 77; and

- That "certain authorities, believed to be Finpol's officers," confiscated cash and documents from the office of corporation ABK-5, during the course of a criminal investigation against Adyl Bektavey, and then followed irregular auditing procedures to "prepare an accusatory document" charging Adyl with an economic crime.

<u>Id.</u>, ¶¶ 108-09.

These allegations, if true, describe abuses of official power for corrupt ends that could not be undertaken by private parties in a marketplace.  In other words, private parties cannot conduct criminal investigations.  Even if the acts and activities Plaintiffs describe touch the commercial realm, the acts can only be described as sovereign, and not commercial, acts for purposes of the FSIA.  See Nelson, 507 U.S. at 358 n.4 ("where a claim rests entirely upon activities sovereign in character – as here – jurisdiction will not exist under the clause regardless of any connection the sovereign acts may have with commercial activity").

The Supreme Court's opinion in Saudi Arabia v. Nelson, 507 U.S. 349, elucidates the distinction.  In Nelson, a state-run hospital in Saudi Arabia recruited Nelson, an American, to work at the hospital and signed an employment contract with him.  Id. at 358.  Once employed, Nelson discovered safety defects in the hospital's equipment and repeatedly reported these defects to hospital officials and the Saudi government, until one day he was summoned to the hospital's security office and arrested.  Id. at 352.  He was taken to a jail cell where agents of the Saudi Government "shackled, tortured and bea[t]" him and kept him for days without food.  Id. at 353.  He remained imprisoned for 39 days on unknown charges and suffered a number of other abuses, until he was eventually released at the request of a U.S. Senator.  Id.  Nelson sued Saudi Arabia, the hospital, and another Saudi agent alleging a series of intentional torts related to his arrest and imprisonment.  Id. at 353-54.

Nelson alleged that the first clause of the FSIA's commercial-activities exception permitted his suit – i.e., that his "action [wa]s based upon a commercial activity carried on in the United States by the foreign state."  28 U.S.C. § 1605(a)(2).  The Supreme Court found that Saudi Arabia's alleged commercial activities in the United States – namely, recruiting Nelson and entering into a contract for his employment – were not the basis for his suit and that any

16

tortious action (such as Nelson's wrongful arrest, imprisonment, and torture) taken by Saudi law-enforcement officials was not commercial in nature. The <u>Nelson</u> Court explained: "The conduct boils down to abuse of the power of its police by the Saudi Government, and however monstrous such abuse undoubtedly may be, a foreign state's exercise of the power of its police has long been understood for purposes of the restrictive theory as peculiarly sovereign in nature." 507 U.S. at 361. This is because

> [e]xercise of the power of police and penal officers is not the sort of action by which private parties can engage in commerce. "[S]uch acts as legislation, or the expulsion of an alien, or a denial of justice, cannot be performed by an individual acting in his own name. They can be performed only by the state acting as such."

<u>Id.</u> at 362 (quoting Lauterpacht, <u>The Problem of Jurisdictional Immunities of Foreign States</u>, 28 Brit. Y. B Int'l L. 220, 225 (1952)). Similarly, investigating, imprisoning, prosecuting, and subjecting a businessman to trial without due process, as well as processing corporate-registration documents, are not the types of activities engaged in, and not benefits that can be conferred, by private players in a commercial market.

Neither can Plaintiffs bring their claim within the ambit of the commercial-activities exemption by alleging that Defendants undertook these peculiarly sovereign activities in collusion with Plaintiffs' business competitors. Plaintiffs argue that the "Finpol Defendants acted in the interests of private parties waiting to grab [Serik's] assets behind the scenes of prosecutorial and judicial decisions behind the closed doors." Opp. at 14. But the suggestion that Finpol acted with the corrupt purpose of aiding Plaintiffs' competitors is precisely the type of evidence – even if supported by Plaintiffs' pleadings – that the Court may not properly consider in evaluating whether the nature of Defendants' activities was "commercial." For instance, in <u>Nelson</u>, the plaintiffs and their *amici* argued that "the Saudi Government subjected Nelson to the abuse alleged as retaliation for his persistence in reporting hospital safety

17

violations, and argue[d] that the character of the mistreatment was consequently commercial." 507 U.S. at 362.  One *amicus* even argued that "the Saudi Government 'often uses detention and torture to resolve commercial disputes.'"  Id. (citation omitted).  The Supreme Court, however, rejected Nelson's attempt to cast Saudi Arabia's actions as commercial: "[T]his argument does not alter the fact that the powers allegedly abused were those of police and penal officers.  In any event, the argument is off the point, for it goes to purpose, the very fact the Act renders irrelevant to the question of an activity's commercial character."  Id. at 363.

Following the Supreme Court's precedent, the D.C. Circuit has found it "abundantly clear" that courts "cannot consider the alleged motive of the [foreign] government in determining whether [plaintiff's] claim if true would involve commercial activity."  Cicippio v. Islamic Republic of Iran, 30 F.3d 164, 167 (D.C. Cir. 1994) (citing Nelson, 507 U.S. at 362).  The exercise of peculiarly sovereign powers, even when motivated by an interest in profit, thus bars application of the commercial-activities exception to Plaintiffs' claims.  In Mwani v. bin Laden, alien victims of the embassy bombing in Kenya filed suit against Osama bin Laden and Afghanistan under the ATS.  With respect to Afghanistan, the plaintiffs sought to invoke FSIA's commercial-activities exception by characterizing "Afghanistan's harboring of terrorist camps as the 'paradigmatically mercantile' provision of land for money."  Id. at 17.  The court rejected this analogy, observing that "such reductive logic would transform the retaliatory torture in Nelson into 'commercial dispute resolution,'" citing the rule that "in determining whether particular conduct constitutes commercial activity," the "key inquiry" is "not to ask whether its purpose is to obtain money, but rather whether the particular conduct . . . is 'the sort of action by which private parties can engage in commerce.'"  Id. (citing Nelson, 507 U.S. at 362)). Answering the question at hand, the court found:

> Granting refuge to terrorist training camps is a uniquely sovereign act; it is
> not the sort of benefit that a commercial landlord can bestow upon a
> commercial tenant.  As the plaintiffs themselves describe, refuge involved
> both the "assigning [of] guards for security" and the "refus[al] to . . .
> extradite" bin Laden. . . . But the Court made clear in <u>Nelson</u> that this
> "[e]xercise of the powers of police" and of authority over "the expulsion
> of an alien" cannot "be performed by an individual acting in his own
> name.  They can be performed only by the state acting as such."

<u>Mwani</u>, 417 F.3d at 17 (quoting <u>Nelson</u>, 507 U.S. at 362; other citations omitted).

The commercial-activities exception, therefore, does not permit Plaintiffs to sue

Defendants in this Court.

### b.  Expropriation Exception

Plaintiffs next contend that this Court has jurisdiction over their suit under the

"expropriation" exception to the FSIA.  This exception provides:

> A foreign state shall not be immune from the jurisdiction of courts of the
> United States or of the States in any case – in which rights in property
> taken in violation of international law are in issue and that property or any
> property exchanged for such property is present in the United States in
> connection with a commercial activity carried on in the United States by
> the foreign state; or that property or any property exchanged for such
> property is owned or operated by an agency or instrumentality of the
> foreign state and that agency or instrumentality is engaged in a
> commercial activity in the United States.

28 U.S.C. § 1605(a)(3).  "For the exception to apply, therefore, the court must find that: (1)

'rights in property are at issue;' (2) 'those rights were taken in violation of international law;'

and (3) 'a jurisdictional nexus [exists] between the expropriation and the United States.'"

<u>Nemariam v. Federal Democratic Republic of Ethiopia</u>, 491 F.3d 470, 475 (D.C. Cir. 2007)

(quoting <u>Peterson v. Royal Kingdom of Saudi Arabia</u>, 332 F. Supp. 2d 189, 196, 197, (D.D.C.

2004), <u>aff'd</u>, 416 F.3d 83 (D.C. Cir. 2005)).  The Court need not consider the first two prongs of

this test, as Plaintiffs' Proposed Amended Complaint clearly falls short of satisfying the third.

The required "jurisdictional nexus is established if: (a) the property 'is present in the United States in connection with a commercial activity carried on in the United States by the foreign state' or (b) the property 'is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality <u>is engaged in a commercial activity in the United States</u>.'" <u>Nemariam</u>, 491 F.3d at 475 (quoting 28 U.S.C. § 1605(a)(3) (emphasis added)). Plaintiffs do not contend that any allegedly expropriated property is "present in the United States." The question presented, therefore, is whether the agency or instrumentality that allegedly owns or operates the property is "engaged in a commercial activity in the United States." <u>Id.</u>

As with § 1605(a)(2), the application of the expropriation exception fails because Plaintiffs have not alleged that Defendants (or any agency or instrumentality of Kazakhstan) are engaged in commercial activity, let alone in the United States. Plaintiffs make much in their Opposition of the Bektayevs' connection to the United States. They allege that Serik managed two U.S. corporations in the 1990s and later invested profits earned by those businesses in Kazakhstan in separate foreign businesses whose assets they now contend have been confiscated by Defendants. <u>See</u> Prop. Am. Compl., ¶¶ 22-25, 28. They further contend – erroneously – that the American corporate Plaintiffs "have a stake in this litigation to protect their principals." <u>Id.</u>, ¶ 146. As noted above, the American corporate Plaintiffs, as non-aliens, lack standing to bring claims under the ATS. <u>See</u> Section III(A)(1), *supra*. Finally, Plaintiffs argue that the "allegations showing the involvement of altogether 5 American corporations (2 in California, 2 in Virginia and one Delaware foundation) are more than sufficient to prevail on the showing that necessary nexus to the U.S." Opp. at 10.

All of these arguments are irrelevant.  The plain language of § 1605(a)(3) requires that

Defendants – *i.e.*, the agency or instrumentality of the foreign state that owns or operates

expropriated property – not Plaintiffs, be engaged in commercial activity in the United States.

As found above, see Section III(A)(2)(b), *supra*, Plaintiffs' Proposed Amended Complaint pleads

the existence of no such commercial activity by Defendants and thus fails to satisfy the FSIA's

expropriation exception.  The Court need not consider whether Defendants' activities – as they

are not commercial – took place in the United States.

c.   The Bilateral Investment Treaty

Plaintiffs additionally contend their suit is exempted from the FSIA's restrictions under

28 U.S.C. § 1604 – the very provision of the Act that establishes a foreign state's sovereign

immunity.  Section 1604 states in full:

> Subject to existing international agreements to which the United States is a
> party at the time of enactment of this Act a foreign state shall be immune
> from the jurisdiction of the courts of the United States and of the States
> except as provided in sections 1605 to 1607 of this chapter.

Id. (emphasis added).   Plaintiffs conveniently omit the underlined clause in their reference to

this section in an effort to argue that Kazakhstan's 1992 ratification of the Treaty Concerning the

Reciprocal Encouragement and Protection of Investment, U.S.-Kazakhstan, May 19, 1992,

103.12 U.S.T. 1 (Bilateral Investment Treaty), "created an exemption from the application of the

FSIA."  Opp. at 6.  Such an exemption is clearly inapplicable.  Section 1604 explicitly exempts

claims based on "international agreements" in existence "at the time of enactment" of the FSIA,

in 1976.  28 U.S.C. § 1604 (emphasis added); see Ye v. Zemin, 383 F.3d 620, 624 (7th Cir.

2004) (immunity provided by FSIA subject "to international agreements to which the United

States was a party in 1976") (emphasis added).  No plausible argument can be made that the

United States' and Kazakhstan's Bilateral Investment Treaty – signed in 1992 and entered into

force in 1994 – was in existence in 1976.  This treaty thus cannot form the basis of an FSIA

exemption under § 1604.

Even if Plaintiffs had instead invoked FSIA § 1605(a)(1) to argue that the Treaty confers

subject-matter jurisdiction on this Court, they would be similarly unsuccessful.  Section

1605(a)(1) provides: "A foreign state shall not be immune from the jurisdiction of courts of the

United States or of the States in any case . . . in which the foreign state has waived its immunity

either explicitly or by implication."  To the extent Plaintiffs assert that Kazakhstan has, by

signing the Bilateral Investment Treaty, waived its sovereign immunity from a claim brought

under the ATS, see Opp. at 16, the Treaty's terms do not support a waiver under the facts alleged

here.

The Treaty discusses the resolution of claims of unlawful expropriation in Article III and

of other investment disputes in Article VI.  Article III provides in relevant part:

> A national or company of either Party that asserts that all or part of its
> investment has been expropriated shall have a right to prompt review by
> the appropriate judicial or administrative authorities of the other Party . . .
> .

Bilateral Investment Treaty, art. III, ¶ 2.  The U.S. State Department's accompanying Letter of

Transmittal explains that Article III "entitles an investor claiming that an expropriation has

occurred to prompt judicial or administrative review of the claim in the host country."  Id.,

103.12 U.S.T. IX.  The host country is clearly the country where the investment was made and

the expropriation occurred – i.e., Kazakhstan.

Article VI defines an "investment dispute" as "a dispute between a Party and a national

or company of the other Party . . ." and identifies the venues in which the aggrieved national or

company may apply for resolution of the dispute.  See Bilateral Investment Treaty, art. VI, ¶¶ 1-

2. One such venue includes "the courts or administrative tribunals of the Party that is a Party to

the dispute." Id., ¶ 2(a). The Letter of Transmittal explains that this option allows an investor to "submit the dispute to the local courts or administrative tribunals of the host country." Id., 103.12 U.S.T. XI.  Once again, in this instance, that means the courts of Kazakhstan.  See also In re Application of Caratube Int'l Oil Co., LLP, 730 F. Supp. 2d 101, 106 (D.D.C. 2010) (observing that corporation that opted to arbitrate contract dispute with Kazakhstan under Bilateral Investment Treaty "also could have brought an action in the Kazakhstan courts") (emphasis added).  This Court cannot find, accordingly, that Kazakhstan's ratification of the Treaty somehow serves as a waiver of its sovereign immunity over the claims pled in this case.

Given that Plaintiffs' claims fail to satisfy each of the FSIA exceptions they invoke, this Court finds that it lacks subject-matter jurisdiction over their suit against Defendants Finpol and the Committee.  Plaintiffs have argued, however, that in the event the Court were to reach this conclusion, they should be allowed to amend their Complaint to assert claims against individual Kazakhstani government officials who they contend are responsible for the allegedly unlawful acts their Complaint describes.  It is to Plaintiffs' Motions for Leave to Amend that the Court now turns.

B.    Motions to Amend

Plaintiffs have moved both to amend their Complaint and for an extension of time to file an amended complaint as a matter of course, see ECF Nos. 33, 37, and they have submitted the Amended Complaint they propose to file.  See Prop. Am. Compl. (ECF No. 33, Attach. 1). Having reviewed their Proposed Amended Complaint, as well as the arguments they put forth in support of leave to file, the Court finds that: 1) their time to file an amended complaint as a matter of course under Rule 15(a)(1) has expired; 2) to allow amendment under Rule 15(a)(2) would be futile, as Plaintiffs have not established that this Court has personal jurisdiction over

the individual defendants they seek to add; and 3) good cause does not exist to extend Plaintiffs'

time to amend as a matter of course.  For these reasons, leave to file the Proposed Amended

Complaint will be denied.

1.    *Amendment as a Matter of Course*

Plaintiffs first seek to amend their Complaint as a matter of course.  Rule 15(a)(1) allows

a party to "amend its pleading once as a matter of course" within:

> (A) 21 days after serving it, or
>
> (B) if the pleading is one to which a responsive pleading is required, 21
> days after service of a responsive pleading or <u>21 days after service of a
> motion under Rule 12(b)</u>, (e), or (f), whichever is earlier.

<u>Id.</u> (emphasis added).  Plaintiffs filed their initial Complaint on January 25, 2010.  On April 5,

2010, Defendants filed a Motion to Dismiss under Rule 12(b), thereby triggering the 21-day

clock for Plaintiffs to amend the Complaint as a matter of course under Rule 15(a)(1).  On

November 10, 2011 – 584 days later – Plaintiffs first attempted the amendment at issue here.

Through a series of mathematic acrobatics, Plaintiffs attempt unconvincingly to show that

a different – and sufficiently later – date should be used for purpose of this calculation.  First, as

Plaintiffs point out, following the D.C. Circuit's issuance of its opinion in <u>Doe v. Exxon Mobile

Corp.</u>, 654 F.3d 11 (D.C. Cir. 2011), last July, the Court permitted Defendants to rebrief their

Motion to Dismiss and denied the original Motion as moot.  In accordance with the new briefing

schedule approved by the Court, Defendants filed a new Motion to Dismiss on September 2,

2011.  <u>See</u> ECF No. 27.  Plaintiffs contend that this is the relevant Rule 12(b) Motion for

purposes of Rule 15(a)(1).  <u>See</u> Mot. to File Am. Compl. at 8.  Even were the Court to accept

Plaintiffs' argument on this point, they are faced with an additional hurdle: another 69 days

elapsed before Plaintiffs first sought to amend.  To address this additional lapse of time,

Plaintiffs argue, without citing any supporting authority, that Rule 15(a)(1)'s 21-day clock

should not begin to run until October 31, 2011 – the date Defendants filed their Reply brief and

sixteen days before Plaintiffs first sought to amend.  Plaintiffs' construction of Rule 15(a)(1)'s

time limits, while creative, is contrary to the plain meaning of the Rule, which states that

amendments as a matter of course must be made within "21 days <u>after service of a motion</u> under

Rule 12(b)."  Fed. R. Civ. P. 15(a)(1) (emphasis added).

Plaintiffs then argue that Defendants' Motion to Dismiss somehow does not trigger their

time to amend under Rule 15(a)(1) because it is not a "responsive pleading."  <u>See</u> Mot. to File

Am. Compl. at 9.  Citing a string of pre-2009 cases in support of this proposition, Plaintiffs

entirely ignore the 2009 amendment to the Federal Rules of Civil Procedure, which restricts the

time period for amendment as a matter of course to 21 days from <u>either</u> the date of service of a

responsive pleading <u>or</u> service of a motion under Rule 12(b), such as Defendants have filed here.

Any way they slice it, Plaintiffs cannot escape the fact that the time for them to amend their

Complaint as a matter of course has long since expired.

2.      *Amendment by Leave of Court*

In the absence of the right to amend their Complaint as a matter of course, Plaintiffs

contend the Court should grant them leave to do so under Rule 15(a)(2), which provides: "In all

other cases, a party may amend its pleading only with the opposing party's written consent or the

court's leave. The court should freely give leave when justice so requires."  As Defendants

oppose Plaintiffs' Motion to Amend, the Proposed Amended Complaint may only be filed with

the Court's leave.

While Rule 15(a)(2) directs courts to permit leave to amend liberally, it is also clear that

amendment should not be permitted if it would be futile.  In other words, if the proposed

amendment would still render the complaint deficient, courts need not grant leave.  <u>See</u> <u>In re</u>

<u>Interbank Funding Corp. Securities Litigation</u>, 629 F.3d 213, 218 (D.C. Cir. 2010) ("[A] district court may properly deny a motion to amend if the amended pleading would not survive a motion to dismiss.") (citing <u>Foman</u>, 371 U.S. at 182, for proposition that "'futility of amendment' is permissible justification for denying Rule 15(a) motion"); <u>James Madison Ltd. v. Ludwig</u>, 82 F.3d 1085, 1099 (D.C. Cir. 1996) ("Courts may deny a motion to amend a complaint as futile . . . if the proposed claim would not survive a motion to dismiss.").

Plaintiffs seek to circumvent the jurisdictional limitations imposed by the FSIA by adding as defendants individual government officials they assert participated in the unlawful acts upon which their Complaint is based.  As Plaintiffs correctly observe, the Supreme Court has recently held that the FSIA does not apply to – and therefore does not bar – suits against individual foreign officials based on actions taken in their official capacity.  <u>See</u> <u>Samantar v. Yousuf</u>, 130 S. Ct. 2278, 2282 (2010).

Although this holding removes one jurisdictional hurdle from Plaintiffs' path, it places another directly in their way.  While the FSIA serves to limit this Court's <u>subject-matter</u> jurisdiction, it automatically establishes the Court's <u>personal</u> jurisdiction over a foreign state as to every claim from which the foreign state is not immune, where service of process has been effected under § 1608, the FSIA's service-of-process provision.  <u>See</u> 28 U.S.C. § 1330.  In contrast, in a case against foreign government <u>officials</u>, sections 1330 and 1608, along with the rest of the FSIA, do not apply.  Plaintiffs will thus have to establish this Court's personal jurisdiction over the individual defendants they seek to add "without the benefit of the FSIA provision that makes personal jurisdiction over a foreign state automatic when an exception to immunity applies and service of process has been accomplished."  <u>Samantar</u>, 130 S. Ct. at 2292 n.20 (quoting 28 U.S.C. § 1330(b)).  Plaintiffs in such cases are thus deprived of a benefit

(automatic personal jurisdiction) just as they are released from a burden (overcoming sovereign immunity).

Plaintiffs disclaim any need to rely on § 1608 and maintain that they can successfully serve the individual would-be defendants "under the local laws of Kazakhstan." Plfs. Reply in Supp. of Mot. to File Am. Compl. at 3. As the D.C. Circuit observed in Mwani, however, "[S]ervice of process does not alone establish personal jurisdiction." 417 F.3d at 8. "Before a court may exercise personal jurisdiction over a defendant, there must be more than notice to the defendant." Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd., 484 U.S. 97, 104 (1987). In addition to "authorization for service of summons on the defendant," there also must be a "constitutionally sufficient relationship between the defendant and the forum." Id.; see also Mwani, 417 F.3d at 8.

To establish that a "constitutionally sufficient relationship" exists between the individual officials and the relevant forum under the Due Process Clause of the Constitution's Fifth Amendment, Plaintiffs must show that these individuals had "'fair warning that a particular activity might subject [them] to the jurisdiction of a foreign sovereign.'" Id. at 11 (quoting Shaffer v. Heitner, 433 U.S. 186, 218 (1977) (Stevens, J., concurring)). As the ATS "contains no long-arm provision of its own," Mwani, 417 F.3d at 9, and the Proposed Amended Complaint contains no allegations linking either Plaintiffs' injuries or the proposed individual defendants' conduct with the District of Columbia such that these officials could be reached by the District's long-arm statute, see D.C. Code § 13-423, this Court would have jurisdiction over the individual officials only if service was authorized by Federal Rule of Civil Procedure 4(k)(2). Under Rule 4(k)(2):

> For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:

(A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and

(B) exercising jurisdiction is consistent with the United States Constitution and laws.

"Whether the exercise of jurisdiction is 'consistent with the Constitution' for purposes of Rule 4(k)(2) depends on whether a defendant has sufficient contacts with the United States as a whole." Mwani, 417 F.3d at 11. It is here that the Proposed Amended Complaint founders.

Plaintiffs must plead facts sufficient to establish this Court's personal jurisdiction over each defendant in one of two forms: "general or all-purpose jurisdiction, and specific or case-linked jurisdiction." Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S. Ct. 2846, 2851 (2011)). To establish general jurisdiction over an out-of-state defendant, a plaintiff must show that "each Defendant's contacts with the forum are 'continuous and systematic,' . . . such that due process is not offended by allowing a United States court to hale the defendant into the forum 'over any matter involving the defendant.'" Allen v. Russian Fed'n, 522 F. Supp. 2d 167, 192-93 (D.D.C. 2007) (quoting Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 415-16 (1984); Doe I v. State of Israel, 400 F. Supp. 2d 86, 108 (D.D.C. 2005)). Conversely, where a court "seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, this 'fair warning' requirement is satisfied if the defendant has 'purposefully directed his activities at residents of the forum,' . . . 'and the litigation results from alleged injuries that 'arise out of or relate to' those activities." Mwani, 417 F.3d at 12 (quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774 (1984); Helicopteros, 466 U.S. at 414).

The individual officials Plaintiffs seek to add as defendants are: the deputy prosecutor for the city of Almaty, Kazakhstan, see Prop. Am. Compl., ¶ 8; the former head of an investigation group of Kazakhstan's Interior Ministry, later the deputy head of the Investigation Directorate of

Finpol, see id., ¶ 9; a deputy to the head of the Investigation Directorate of Finpol, see id., ¶ 10; the deputy head of the detention center in Almaty, see id., ¶ 11; and a senior officer of the detention center in Almaty.  See id., ¶ 12.  Nowhere in their Proposed Amended Complaint do Plaintiffs allege any facts showing that these individual officials have had any – let alone "continuous and systematic" – contact with the United States.  See Helicopteros, 466 U.S. at 415-16.  The Court, accordingly, cannot find, based on the allegations contained in the Proposed Amended Complaint, that it would have general personal jurisdiction over the proposed individual defendants.

Neither do Plaintiffs allege facts to support this Court's exercise of specific personal jurisdiction over these officials.  Plaintiffs' Proposed Amended Complaint includes new allegations based on these individuals' participation – in Kazakhstan – in the criminal investigation, prosecution, and detention of Serik Bektayev, a Kazakhstani citizen who, despite his past business dealings in the United States, is nowhere alleged to be a resident thereof.  There are, further, no allegations that Defendants in any way directed their activities described in this case toward the United States.

Because the Court finds that Plaintiffs' Proposed Amended Complaint would not survive a motion to dismiss, leave to file it will be denied on the ground of futility.

3.    *Extension of Time to Amend as a Matter of Course*

Finally, Plaintiffs have also sought leave to amend their Complaint through yet another procedure – by moving "for leave *nunc pro tunc* to extend time to filed [an] amended complaint as a matter of course."  See ECF No. 37.  Plaintiffs rely on the decision of another court in this District, see Hayes v. District of Columbia, 275 F.R.D. 343 (D.D.C. 2011), to support this avenue for relief.  Hayes, however, merely recognizes that under Federal Rule of Civil Procedure

6(b), this Court "has the <u>authority</u> to extend . . . the 21-day time period for filing an amended complaint as a matter of course" where "good cause" is shown.  275 F.R.D. at 345 (emphasis added); Fed. R. Civ. P. 6(b).

For the same reasons that this Court finds that the amendment Plaintiffs propose would be futile, <u>see</u> Section III(B)(2), *supra*, it finds that they have not shown there exists good cause to allow them an extension of time to amend their Complaint as a matter of course.

**IV.    Conclusion**

For the reasons articulated above, an Order accompanying this Memorandum Opinion will dismiss the Complaint without prejudice and deny Plaintiffs' Motion for Leave to Amend and Motion for Extension of Time to File Amended Complaint as a Matter of Course.

*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  <u>April 16, 2012</u>